# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

_____

**RONNIKA A. JOYNER,**

**Plaintiff,**

**v.**                        Case No. _____

**ANJE COLLINS, and**        **DEMAND FOR JURY TRIAL**
**THE LUXE PR GROUP,**

**Defendants.**
_____

## COMPLAINT

COMES NOW Ronnika A. Joyner, through her attorney, STEPHEN V. BUSH, and brings this

Complaint and alleges:

### NATURE OF ACTION AND RELIEF SOUGHT

1. This is a civil action seeking a declaratory judgment, damages for intentional

   misrepresentations under Title II of the Digital Millennium Copyright Act, as codified at 17

   U.S.C. § 512, damages for defamation, commercial disparagement, damages for interference

   with business relations, breach of contract damages, and payments owed to Plaintiff as an

   independent contractor to Defendant Luxe PR Group (hereinafter "Luxe"), owned by

   Defendant Anje Collins.

2. This case arises from malicious actions taken by Defendant Anje Collins, an entertainment

   public relations ("PR") professional, resulting from her fears that Plaintiff Joyner conspired

and attempted to poach clients away from Luxe PR. Defendant's actions include copyright infringement claims over photography taken by Joyner, false and harmful statements made publicly and privately about Joyner via direct communications as well as social media outlets followed by other PR professionals and clients, improper communications to clients of Joyner independent of her relationship to Luxe, and failure to make contractual payments to Joyner for work she performed on behalf of Luxe. As a result of Defendant's copyright infringement complaints made to the photo-sharing website Instagram, various images and videos captured and posted by Joyner were removed, in violation of Joyner's copyright in those works, disrupting and removing public documentation of her career. Additionally, Joyner continues to suffer serious reputational and financial difficulty as a result of false statements about her professional conduct made publicly and privately to the PR industry by Defendant, in addition to the added financial struggle resulting from broken agreements and lost opportunities.

3. Because the pictures taken by Joyner were her own creations in which she owned full copyright protections despite removal from social media based on false premises, Joyner brings this action to refute the assertion of copyright infringement, seeking a declaratory judgment to prevent further claims from being asserted by Defendant, in addition to damages under the Digital Millennium Copyright Act, 17 U.S.C. § 512(f), in compensation for the defendant's knowing and material misrepresentations made to Instagram that Joyner violated Defendant's copyrights.

4. Joyner also seeks judgment against Defendants and payment of damages in compensation for the harm suffered as a result of public defamatory statements about her profession, for

disparaging her business, and for defendant's malicious interference with Joyner's business relations.

5. Finally, Joyner seeks judgment against Defendant for breach of contract, unjust enrichment, and for contract damages to be awarded to her in compensation for Defendant's failure to make payments owed in exchange for professional services rendered by Joyner under the independent contractor agreement, as well as the value of business relationships Joyner forwent as a precondition to contracting with Defendant.

## PARTIES

6. Plaintiff Ronnika A. Joyner is a resident of Atlanta, Georgia.

7. iGN PR, LLC is a limited liability company organized and existing under the laws of Georgia, with its principal place of business at PO Box 672502, Marietta, GA, 30006.

8. Defendant Anje Collins is the owner of The Luxe PR Group, and is a resident of Las Vegas, NV.

9. Defendant Luxe PR Group is a limited liability company organized and existing under the laws of Nevada, with its principal place of business at 6671 S. Las Vegas Blvd., Building D, Suite 210, Las Vegas, Nevada, 89119.

## JURISDICTION AND VENUE

10. The Court has subject matter jurisdiction because this action arises under the copyright laws of the United States, 17 U.S.C. §§ 101 *et seq*., Title II of the Digital Millennium Copyright Act (hereinafter the "DMCA"), 17 U.S.C. § 512, 28 U.S.C. §§ 1331 and 1338, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

11. The Court has personal jurisdiction over Anje Collins and the Luxe PR Group because Collins intentionally caused harm to Joyner in Georgia, contracted with Joyner for work

performed in Georgia, and, on information and belief, conducts regular business in Georgia.

12. The Court also may exercise diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332. The Parties are diverse because Plaintiffs are located in Georgia, while Defendants reside in Nevada and the amount in controversy exceeds $75,000 because the amounts owed to Plaintiff under the parties' agreement, in addition to the value of business opportunities forgone as a precondition to contracting have a cumulative value in excess of $75,000.

13. The Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, because the state and federal copyright claims are a part of the same set of retaliatory actions taken by the Defendant as a result of her misapprehensions and retaliatory actions towards Plaintiff.

14. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District, including Defendant's negotiations, entry into, and execution of contractual and business arrangements with clientele and vendors in this District for the purpose of reaching an audience residing within this District.

15. Venue is also proper under 28 U.S.C. § 1391(b)(3) because Defendant is subject to personal jurisdiction in this District, as alleged in Paragraph 11 of this Complaint.

## FACTUAL ALLEGATIONS

16. Ronnika A. Joyner is a PR professional living in Atlanta, Georgia who specializes in developing the public presence of her clients, managing clients' social media presence,

and planning publicity and fundraising events with the goal of expanding the clients' audience and public familiarity.

17. Joyner owns iGN PR, LLC, a limited liability company organized under the laws of the state of Georgia, which is the business entity through which she offers PR services and employs other PR professionals.

18. Anje Collins is based out of Las Vegas, NV, but regularly employs her PR services in Atlanta and Miami as well as Las Vegas and other populous cities within the United States. Collins owns the Luxe PR Group, a limited liability company organized under the laws of the state of Nevada, and is the entity that Joyner contracted with as an independent contractor under the agreement in question.

19. Joyner and Collins met while working various publicity events in which both parties' clients were involved, and the relationship between the parties gradually developed to the point of contemplating working together on future projects.

20. The parties reached a verbal agreement in June of 2015 in which Joyner would assist Luxe with business endeavors in Atlanta Georgia and the surrounding areas based on her residence and network in Georgia, in exchange for payment.

21. During the contractual engagement with Luxe, Joyner continued to maintain iGN PR LLC as the entity through which she represented herself professionally, and maintained the website for iGN through which she would showcase the work performed for various other clients independently and through other contractual relationships, including Luxe PR.

22. Joyner was never required to fill out any tax withholding documents as a requirement to be paid by Luxe, no amounts were withheld by Luxe from the fees actually paid to Joyner

for services rendered, and no taxes or other governmental fees were ever remitted by Luxe on behalf of Joyner.

23. Joyner performed her contractual services on her own time at locations decided upon by her, aside from specific events and meetings, was able to provide her own assistants, and used electronic equipment such as cameras and phones that were independently owned and provided by her or iGN PR.

24. Joyner was free to engage with other PR agencies and individuals, and was free to contract with these parties to perform similar services as those she performed for Luxe.

25. Joyner was not obligated to perform work for every client provided by Luxe, and could turn down any specific project of her choosing.

26. No other agreements or provisions, written or otherwise, were entered into between the parties, and the oral contract that directed the parties' actions was based on an understanding of only a few general terms. These terms included a percentage split of client fees, in which Joyner would receive 70% of the fee, paid by the client to Luxe, for services she directly provided to these clients in which she was the project lead, or 30% of client fees paid to Luxe when she was not the lead on a project for that particular client.

27. Joyner was responsible for all details surrounding client projects that she was in charge of, including event planning, media marketing, and any other work performed, in addition to personally handling various expenses incurred and a wide variety of administrative duties.

28. When Collins provided a client to Joyner, Joyner had full responsibility for that client, and had control over how her services would be executed, including setting up meetings

with clients, deciding upon venues for events, drafting publicity literature for the client, and handling expenses that were incurred as a result of her services.

29. For other projects in which Joyner played a supporting role, she would help organize venues, provide furniture, handle food and beverage vendors, and provide transportation for the clients at her own expense, in addition to any other task that was necessary.

## DEFENDANTS' FAILURE TO PAY

30. On September 9, 2015, Joyner assisted in organizing and executing an album release party for clients Kandi and Demetria McKinney, for which she received no share of client fees paid to Luxe.

31. On October 26, 2015, Joyner assisted in organizing and executing a baby shower client Tonisha Jackson hired Luxe to present and run, for which Joyner received no share of client fees paid to Luxe.

32. Beginning on October 26, 2015 and ending November 13, 2015, Joyner assisted in organizing and executing a series of interviews and photo-shoots for client Rob Riley, in addition to personally transporting the client to and from the events, for which she received no share of client fees paid to Luxe.

33. On November 1, 2015, Joyner assisted in organizing and executing a photography exhibit for client Tomiya Colvin, for which Joyner received no share of client fees paid to Luxe.

34. On November 14, 2015, Joyner assisted in organizing, executing, and cleaning up afterwards, an event for client Pynk Magazine, for which she received no share of client fees paid to Luxe.

35. On November 29, 2015, Joyner assisted in organizing and executing a 'cupcakes and stories' event for client Denise Wiggins, for which she received no share of client fees paid to Luxe.

36. On December 5, 2015, Joyner assisted in organizing and executing an 'upscale brunch' for client Cynthia Bailey, for which she received no share of client fees paid to Luxe.

37. On December 17, 2015, Joyner assisted in organizing and executing a brunch for client Kash Doll, for which she received no share of client fees paid to Luxe.

38. On January 9, 2016, My Joyner assisted in organizing and executing a private brunch for client Demetria McKinney, for which she received no share of client fees paid to Luxe.

39. On February 20, 2016, Joyner assisted client Dedra Allen with her event showcasing the grand opening of the Jdoah Academy, for which she received no share of fees paid to Luxe.

40. On March 18 & 19, 2016, Joyner assisted client Rob Riley with organizing interviews and a private dinner event, including providing transportation, logistics, and representation at the end, for which she received no share of client fees paid to Luxe.

41. On March 30, 2016, Joyner assisted in organizing and executing the event 'Getto and Blues Showcase' for which Luxe was hired, for which she received no share of client fees paid to Luxe.

42. On May 2, 2016, Joyner assisted, and ultimately gained full responsibility while Collins was ill, for organizing and executing a mother's day brunch for client Demetria McKinney, for which she received no share of client fees paid to Luxe, and for which Collins took full credit.

43. On September 16, 2016, Joyner assisted in organizing and executing an interview with client Rob Riley, in addition to meeting with the client in preparation for the interview, for which she received no share of client fees paid to Luxe.

44. Between the months of June 2015 and June 2016, Joyner was paid a total sum of $1,600 for services she provided to Luxe with regard to projects for two clients Kela, and Reece Odum.

45. Towards the end of June 2016, Collins was frequently unavailable due to illness, during which time Joyner handled the majority of Luxe's client projects, in addition to her own through iGN PR. Joyner was thus more present to a larger portion of important clients, and her reputation was elevated as a result of her work.

46. Joyner additionally launched a book in June of 2016, which she explicitly dedicated to Collins as a token of gratitude for the experience and skill she gained while working with Luxe. Joyner's book further elevated her presence within the PR industry.

47. In the spring of 2016, Joyner began expressing to Collins that she was no longer willing to work without proof of payment, and that otherwise she would not be a part of upcoming projects.

48. Upon information and belief, Joyner is owed at a minimum $25,000 for the services she performed, not including interest or costs incurred that were never reimbursed.

### DEFAMATORY STATEMENTS MADE BY DEFENDANT

49. Beginning on June 25, 2016 and continuing through October, Collins began disparaging Joyner publicly, by inferring that Joyner had been attempting to steal clients away from Luxe, warning others not to work with her based upon her alleged disloyalty.

50. Collins' 'followers' on social media include both a large portion of the PR industry as well as past, present, and potential clients, including celebrities, authors, media networks, etc.

51. Concurrent with Collins' defamatory actions, Collins posted public notices to clients and other followers that Joyner was no longer working with Luxe, and that Joyner was in no way associated with any of the clients she had worked with on behalf of Luxe.

52. Immediately after filing the DMCA takedown notices on July 19th, Collins publicly inferred that Joyner had posted pictures of Luxe's clients on her website and social media in attempts to subordinate the reputations of Collins and Luxe PR to her own company.

53. Collins further made false statements both publicly and privately that Joyner was only an employee of Luxe PR, and that Luxe had bought out iGN PR at the beginning of their engagement, in attempts to subordinate Joyner in front of clients.

54. On September 8th, Collins told Rob Riley, a client of Luxe and with whom Joyner had worked during the engagement with Luxe, that Joyner stole money from Collins that she then used to start her own company.

55. On September 18th, Collins called a member of the Black Chef Network, a client solely of iGN PR, attempting to steal Black Chef Network from Joyner by promising big television deals and disparaging Joyner as a professional.

56. On October 4th, the undersigned counsel sent a demand letter to Collins giving her notice of the legal claims included in this Complaint, notice of demand for payment under the contract, and requesting that the public statements be taken down and corrected through the same channels, so as to avoid further harm to Joyner's profession based on false attacks. A true and correct copy of the demand letter is attached as "Exhibit A."

57. Upon receipt of the demand letter, Collins publicly posted a snapshot of the letter on her social media pages, again boastfully claiming that Joyner was an employee of Luxe, that Joyner had attempted to steal clients away, that Joyner's attempts to be made whole were the result of a lack of gratitude, and that Joyner would never win against her, in addition to other various public bullying statements.

58. On October 5th, Defendant's attorney sent a reply letter again denying all of Joyner's requests. A true and correct copy of this response letter is attached as "Exhibit B."

59. In Defendant's reply letter, Defendant's attorney alluded to an agreement she had sent to Plaintiffs' counsel in September of 2016, which she purports to be the written agreement between Joyner and Luxe, despite that agreement clearly concerning different companies, different legal circumstances altogether, as well as the absence of any signatures. A true and correct copy of that agreement sent by counsel for Defendants is attached as "Exhibit C."

60. On October 5th, undersigned counsel sent an email to Luxe's attorney pointing out Collins' decision to post Joyner's demand letter online. The attorney responded stating her awareness and support of Collins' actions, that her main reason for filing DMCA takedowns was because of the clients' publicity rights, in addition to an admission that Joyner was hired as an independent contractor. A true and correct copy of this email is attached as "Exhibit D."

### PLAINTIFF'S COPYRIGHTED WORKS, THE DIGITAL MILLENNIUM COPYRIGHT ACT, AND THE "TAKEDOWN" PROCEDURE

61. Section 101 of the Copyright Act, 17 U.S.C. § 101, defines a "work made for hire" as a work prepared by an employee within the scope of his or her employment, or a work falling under one of the specific types listed in § 101 that is created by an independent

contractor, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

62. Title II of the Digital Millennium Copyright Act of 1998 ("DMCA"), 17 U.S.C. § 512, grants online service providers such as Instagram protections from secondary copyright infringement liability, so long as they meet certain requirements.

63. One requirement of this DMCA "safe harbor" is that online service providers must implement a "notice-and-takedown" system.

64. The DMCA provides that the owner of copyrighted material may submit a "takedown notice" to an online service provider that is hosting material that allegedly infringes the copyright held by the issuer of the notice.

65. The DMCA provides that a takedown notice should be in writing and should state, among other things, that the complaining party has a good faith belief that the use of the material is not authorized by the copyright owner or by law. 17 U.S.C. § 512(c)(3).

66. Upon receipt of a proper takedown notice, a service provider must "respond [] expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity." 17 U.S.C. § 512(c)(1)(C).

67. The DMCA then provides that the user who posted the allegedly infringing material that is the subject of the takedown notice may in turn submit a "counter-notice" contesting the claim of infringement.

68. In order to be valid, the counter-notice must include the user's contact information, a signature, a statement under penalty of perjury that the "material was removed or disabled as a result of a mistake or misidentification," and the user's consent to the jurisdiction of his or her local federal court. 17 U.S.C. § 512(g).

69. Section 512(f) of the DMCA also creates a cause of action for the user who posted the allegedly infringing material against "[a]ny person who knowingly materially misrepresents under this section (1) that material or activity is infringing, or (2) that material or activity was removed or disabled by mistake or misidentification." 17 U.S.C § 512(f).

70. From the time the oral contract was entered into by the parties in June of 2015 up until the issues arose in June of 2016, plaintiff was a part of a wide variety of client events, in addition to events she worked or attended on behalf of Luxe, including but not limited to awards shows, book launches, celebrity dinners and brunches, and client interviews on television programs, all of which were photographed and/or filmed and presented to the public by many other entities and individuals not associated with Luxe PR.

71. During many of these events, Joyner used her own camera to take pictures of the clients publicly interacting with media and fans, which she would post to Instagram on occasion showcasing her current endeavors.

72. Joyner also posted many pictures and videos of other events and individuals that were clients or friends of her own and had nothing to do with Luxe PR, including pictures that were taken prior to her engagement with Luxe.

73. On July 19, 2016, the attorney for Collins and Luxe PR filed takedown notices under § 512 of the DMCA for every photo and video taken by plaintiff during the term of her engagement with Luxe PR, photographs and videos of Joyner's independent clients taken by her concurrently and prior to her engagement with Luxe PR, and photographs that had nothing to do with clients of any kind but were posted on her personal page.

74. On July 22, 2016, Joyner began filing counter-notices to each of Defendant's takedown claims, in full compliance with § 512(g).

75. When confronted by Joyner, Defendants' attorney provided no basis for these infringement claims other than being left with no other choice but to claim copyright infringement in order to protect the publicity rights of Luxe's clients, a position she reinforced in the Exhibit D attached to this Complaint, her October 5th reply email to undersigned counsel.

76. Defendant further threatened to attack the iGN PR website as well if Joyner didn't take down the website's content, which includes many of the same pictures and videos.

77. At the filing of this Complaint, a large portion of Joyner's content that was taken down by Instagram is still unable to be added back by Instagram due to technical issues, delays, and the volume of works removed.

78. Joyner was forced to take the time to file a counter notice for each and every picture or video taken down as a result of Defendant's actions, and was forced to find legal counsel in order to seek retribution, despite the financial difficulties resulting from Defendant's failure to pay.

## COUNT I

### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201, *ET SEQ.* AND THE COPYRIGHT ACT, TITLE 17 OF THE U.S. CODE

79. Ms. Joyner incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

80. There is a real and actual controversy between Plaintiff Joyner and Defendants regarding whether the photographs and videos taken by Joyner and used by her while contracting with Defendants Luxe and Collins infringe a copyright that Defendants own.

81. Defendants continue to act upon the belief that Luxe PR owns Joyner's works despite admissions that Joyner was an independent contractor, without any signed agreement denominating Joyner's photography as works made for hire.

82. Collins' actions have forced Joyner to defend the validity her own works to the PR industry because of Collins' fearful misapprehensions, and have prevented Joyner from fully portraying the extent of her professional career to other professionals and potential clients.

83. Joyner is entitled to declaratory judgment that her works are her own, and that based on the nature of the independent contractor relationship and absence of any written agreement, her use of these works is lawful and does not infringe Defendants' copyright, for which suit may be filed.

## COUNT II

### VIOLATION UNDER SECTION 512(F) OF THE DIGITAL MILLENNIUM COPYRIGHT ACT

84. Ms. Joyner incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

85. Joyner's photographs and videos are her own creations and her use of these works does not infringe any copyright that Collins' purports to have in them.

86. Defendant Collins and the attorney acting on behalf of Luxe PR knew that these works did not infringe upon any copyright owned by Collins or by Luxe PR when the takedown notices were filed, which were nothing more than methods of bullying and retaliation.

87. Defendants filed copyright infringement claims in bad faith, knowingly and materially misrepresenting that Luxe PR owned the works created by Joyner, in addition to providing baseless justifications for doing so.

88. In the alternative, Defendants should have known, if in fact the claims were made with reasonable care or diligence, that the works created by Joyner were her own and did not infringe any copyright owned by either Luxe or Collins.

89. As a direct and proximate result of Defendants' actions, Plaintiff has been injured substantially and irreparably. Such injury includes, but is not limited to, the financial and personal expenses associated with responding to the claims of infringement, harm to Joyner's free speech rights under the First Amendment, harm to her professional reputation, the continuing absence of her works for her own use, and attorneys' fees and costs.

## <u>COUNT III</u>

### BREACH OF CONTRACT

90. Ms. Joyner incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

91. The parties entered into a contractual arrangement in which Joyner agreed to perform her professional PR services for clients in Atlanta, Georgia, as a contractor to Luxe PR.

92. In exchange, Defendant Collins agreed to compensate Joyner based on a percentage of the total fees paid to Luxe PR by each specific client for whom Joyner provided services.

93. Plaintiff complied with all conditions precedent and other requirements of the independent contractor agreement.

94. By refusing to pay Joyner for the services she performed for Luxe, Defendant Collins, acting on behalf of Luxe PR, breached the contract between the parties and owes Plaintiff an amount of damages to be proven at trial.

## COUNT IV

### UNJUST ENRICHMENT

95. Ms. Joyner incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

96. As a result of Joyner's professional services performed pursuant to the agreement, Defendants have reaped the value of Joyner's services and were unjustly enriched as a result of failure to pay any monetary compensation.

97. By refusing to pay Joyner for the services she performed from which Luxe PR and Collins benefited, Joyner is owed restitution for providing this benefit for which she was never compensated, the amount of which is to be proven at trial.

## COUNT V

### DEFAMATION

98. Ms. Joyner incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

99. Defendant Collins' statements about Joyner are false and untrue, and were thus defamatory in nature.

100. By posting statements concerning Joyner on social media pages followed by countless individuals on the internet with the intent of spreading the purported truth to as many people as possible, and given Collins' vast professional reach, these defamatory statements were made publicly on a grand scale.

101. The false and defamatory statements were published negligently, with the intent of causing Plaintiff damages, including monetary losses, emotional distress, and injury to her reputation.

102. Defendant published the false and defamatory statements with the knowledge that the statements were false, or with reckless disregard as to the falsity of the statements.

103. Joyner's reputation was significantly damaged as a result of the defamatory statements, leading to lost client relationships and potential future contractual and employment opportunities as a result.

104. The amount of these damages is to be proven at trial.

<u>**COUNT VI**</u>

**COMMERCIAL DISPARAGEMENT**

105. Ms. Joyner incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

106. Defendant Collins' statements about Joyner are false and untrue, and disparaged Joyner's business and services.

107. By posting statements concerning Joyner's professional services on social media pages read by countless individuals on the internet with the intent of spreading the purported truth to as many people as possible, and given Collins' vast professional reach gained through her career, these defamatory statements were made publicly on a grand scale.

108. Defendant negligently published the false and disparaging statements concerning Joyner's business and professional services, causing her customers to regard Joyner's business conduct as dishonest, imputing deceit, dishonesty, and reprehensible conduct to iGN PR LLC.

109. Defendant published the false and defamatory statements with the knowledge that the statements were false, or with reckless disregard as to the falsity of the statements.

110. The amount of these damages is to be proven at trial.

## COUNT VII

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

111. Ms. Joyner incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

112. Defendant Collins intentionally damaged Joyner's relationships with her clients and business relationships.

113. In damaging such relationships, Collins acted improperly and without privilege.

114. Such damage was caused purposefully and with malice with the intent to injure Joyner and her business.

115. As a direct and proximate result of such injury, Plaintiffs have suffered damages for which Defendants are liable to Plaintiffs.

116. The amount of damages is to be proven at trial.

## COUNT VIII

### ATTORNEYS' FEES

117. Ms. Joyner incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

118. The misfeasance and wrongful conduct of Defendants evidences such bad faith, vexatiousness, stubborn litigiousness, and was carried out with such conscious and reckless disregard of the rights of Plaintiffs that such conduct on the part of Defendants entitles Plaintiffs to recover reasonable costs and expenses, including but not limited to, attorneys' fees incurred in connection with this action.

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

1. For a declaration that the photographs and videos taken by Joyner that were taken down as a result of Defendants' infringement claims are Joyner's alone based on the

contractual relationship between the parties, and do not infringe upon any copyright owned by Collins or Luxe PR;

2. For an order enjoining Defendants Collins, The Luxe PR Group, its agents, attorneys, and assigns from asserting a copyright claim against Ronnika Joyner for the unrestricted use of her works;

3. For Plaintiffs to be awarded contractual, compensatory, consequential and punitive damages in amounts to be determined at trial;

4. For costs of suit incurred herein, including reasonable attorneys' fees; and

5. For such other and further relief as the Court may deem just and proper.

Respectfully submitted this 29th day of November, 2016.


**VINCELEGAL, LLC**

<u>s/ Stephen V. Bush</u>
Stephen V. Bush
Georgia Bar No. 680682
Attorney for Plaintiffs Ronnika A. Joyner
And iGN PR, LLC


1266 West Paces Ferry Rd. NW
Unit #411
Atlanta, GA 30326
Svbush@vincelegal.com
T: (770) 402-1757
F: (404) 393-5744

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all claims asserted herein.

Date: November 29th, 2016

**VINCELEGAL, LLC**

s/ Stephen V. Bush
Stephen V. Bush
Georgia Bar No. 680682
Attorney for Plaintiffs Ronnika A. Joyner
and iGN PR, LLC

1266 West Paces Ferry Rd. NW
Unit #411
Atlanta, GA 30326
Svbush@vincelegal.com
T: (770) 402-1757
F: (404) 393-5744